**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| IN RE: BITTREX, INC., | : | Chapter 11 |
| | : | Case No. 23-10598 (BLS) |
| Wind Down Entity. | : | Jointly Administered |
| | : | |
| AZIM GHADER, | : | |
| Appellant, | : | |
| v. | : | |
| | : | Civ. No. 24-686-JLH |
| THE PLAN ADMINISTRATOR, | : | |
| | : | |
| Appellee. | : | |

Donald J. Detweiler, Womble Bond Dickinson (US) LLP, Wilmington, DE,

    *Counsel for Appellant, Azim Ghader.*

Robert A. Zink, Daniel R. Koffmann, Razmig Izakelian, Quinn Emanuel Urquhart & Sullivan, LLP, Los Angeles, CA; Robert S. Brady, Kenneth J. Enos, Rebecca L. Lamb, Young Conaway Stargatt & Taylor, LLP, Wilmington, DE,

    *Counsel for Appellee, David Maria, as Plan Administrator.*

**<u>OPINION</u>**

September 17, 2025

HALL, U.S. DISTRICT JUDGE

## I.    INTRODUCTION

This appeal arises from the chapter 11 cases of Bittrex, Inc. ("BUS") and its affiliated debtors (together, the "Debtors").  From 2014 until the filing of its chapter 11 petition, BUS (and together with its Debtor and non-Debtor affiliates, "Bittrex") operated an online cryptocurrency exchange. Azim Ghader ("Appellant") is a cryptocurrency investor and trader who was a resident of Iran when he opened an account with Bittrex in 2017.  A few months later, Bittrex learned that the screening procedures provided by a third-party vendor had failed to screen customers like Appellant who may be subject to U.S. sanctions.  In June 2017, Bittrex suspended Appellant's account and any others with a nexus to Iran until Bittrex obtained a license from the Office of Foreign Assets Control ("OFAC") to release cryptocurrencies from those accounts.  Bittrex eventually obtained that license and informed customers how to withdraw their funds in compliance with the conditions of the OFAC license.  Appellant did not complete the withdrawal process before the license expired.

In early 2023, Bittrex announced that the Debtors would begin to wind down their operations and notified customers that they had a period of time to withdraw cryptocurrencies from the exchange. At that time, Appellant provided documents to Bittrex that appeared to establish that he resided in Turkey, and Bittrex thereafter permitted him to withdraw cryptocurrencies associated with his account.  He withdrew over 99% of his assets, leaving behind certain cryptocurrency assets worth approximately $4,000.

Following the Debtors' chapter 11 filing on May 8, 2023, Appellant filed claims totaling $88 million dollars, alleging lost value and damages he suffered when Bittrex suspended his account, based on a litany of contract and tort theories.  Following plan confirmation, the Debtors' plan administrator objected to Appellant's claims, arguing, *inter alia*, that the terms of service applicable to Appellant's account (1) barred the kind of incidental, consequential, and punitive damages

1

Appellant sought in his claims, and (2) disclaimed liability for freezing access to customer accounts. The plan administrator further argued that Appellant could not pursue tort claims resulting from the disabling of his accounts as those claims were barred by the applicable statutes of limitation.

At a final pretrial conference on January 12, 2024 (A2443-2477), Appellant proffered a new theory: that the terms of service he accepted when opening his account were void *ab initio* due to the OFAC sanctions and thus unenforceable. Beginning on January 16, 2024, the Bankruptcy Court held a four-day trial. At the outset of the trial, the Bankruptcy Court issued an oral ruling sustaining the plan administrator's motion to exclude the testimony of one of Appellant's expert witnesses (1/16/24 Tr. at 8:14–9:11; A2478) (the "Expert Ruling"). On January 26, 2024, the Bankruptcy Court issued a letter ruling (Des. Bankr. D.I. 980; A-3016)[1] ("Letter Ruling") denying Appellant's request to present additional argument and briefing on the issue of whether the applicable terms of service were void *ab initio*. On February 9, 2024, Appellant filed a motion for reconsideration of the Letter Ruling (Des. Bankr. 1012; A3076) (the "Motion for Reconsideration").

On May 22, 2024, the Bankruptcy Court issued a comprehensive decision, *In re Bittrex, Inc.*, 2024 WL 2347311 (Bankr. D. Del. May 22, 2024) ("the Bankruptcy Court's Opinion"), summarizing the extensive evidentiary record, making detailed findings and addressing Appellant's many arguments. On June 4, 2024, the Bankruptcy Court issued the accompanying order, which sustained the plan administrator's claim objection, disallowed Appellant's claims for damages, limited Appellant's claims to the cryptocurrency associated with his accounts, and denied Appellant's Motion

---

[1] "Des. Bankr. D.I." refers to the docket of the chapter 11 case of Desolation Holdings LLC (Case No. Case 23-10597), and "BUS Bankr. D.I." refers to the docket of the chapter 11 case of Bittrex, Inc. (Case No. 23-10598). "A__" refers to the documents included in the appendix (D.I. 13) to appellee's answering brief, including the following transcripts: A2003-2021 ("12/11/23 Tr."); A2021-2094 ("12/13/23 Tr."); A2095-2106 ("12/20/23 Tr."); A2443-2477 ("1/12/24 Tr."); A2478-2666 ("1/16/24 Tr."); A2667-2849 ("1/17/24 Tr."); A2850-3015 ("1/18/24 Tr."); A3018-3075 ("1/29/24 Tr.").

for Reconsideration (BUS Bankr. D.I. 205) (the "Order").  Appellant timely appealed the Order, including the Expert Ruling and Letter Ruling.  (D.I. 1.)  For the reasons set forth below, the Court will affirm the Order.

## II.    BACKGROUND

### A.    The Debtors

The factual background relevant to this dispute is set forth in detail in the Bankruptcy Court's Opinion.  *See In re Bittrex, Inc.*, 2024 WL 2347311 (Bankr. D. Del. May 22, 2024).  The Debtors are four entities: Bittrex Inc. ("BUS"), Bittrex Malta Ltd. ("Malta OpCo"), Desolation Holdings LLC ("Desolation"), and Bittrex Malta Holdings Ltd. ("Malta Holdings").  *Id.* at *2.  BUS started in February 2014 with the incorporation of its predecessor, Bittrex, LLC, in Nevada.  *Id.*  Malta OpCo is a Maltese private limited company that was created in 2018 to serve non-U.S. customers until it ceased operations in 2019.  *Id.*  Bittrex operated a cryptocurrency exchange (the "Exchange") that provided "an online platform for access to the [cryptocurrency] exchange to customers in different jurisdictions."  *Id.* (citing Des. Bankr. D.I. 11 (A74–123) ("First Day Decl.") at ¶ 1).  The record reflects that BUS was a money services business that was required to comply with regulations issued by OFAC, the Financial Crimes Enforcement Network ("FinCEN"), and the Securities and Exchange Commission ("SEC").  *Id.*

In February 2016, Bittrex retained BlockScore, a third-party vendor, to screen customers and potential customers for compliance with sanctions programs of the United States government.[2]  The Debtors anticipated that BlockScore would provide comprehensive sanctions screening services, covering the detection of customers with a nexus to sanctioned countries.[3]  These services were

---

[2] 1/16/24 Tr. at 56–57, 112 (A2533–34, A2589); A8949–50 (OFAC Settlement Agreement).

[3] 1/16/24 Tr. at 57 (A2534); A8949–50; A8957 (FinCEN Enforcement Action Press Release, dated Oct. 11, 2022; A5987 (Bittrex Response to Administrative Subpoena, dated Jan. 10, 2018).

necessary because sanctions imposed by the U.S. government prohibited residents of specified countries—including Iran—from joining or utilizing the Exchange.[4]  *In re Bittrex,* 2024 WL 2347311, at *2.  However, in October 2017, Bittrex discovered that BlockScore only verified that Bittrex's customers were not included on the List of Specially Designated Nationals and Blocked Persons and other similar lists (the "SDN Lists") maintained by OFAC.[5]  As a result, customers who resided in Iran and other sanctioned jurisdictions were improperly permitted to join the Bittrex platform and trade on it until the fourth quarter of 2017.[6]  David Maria (the "Plan Administrator"), who was later appointed as plan administrator under the Debtors' confirmed plan of liquidation, does not dispute that Bittrex violated OFAC regulations by offering and providing services to residents of Iran.

### B.    Appellant's Account Opening and the 2015 Terms of Service

Appellant is a dual citizen of Iran and the Commonwealth of Dominica.[7]  On June 10, 2017, while a resident of Iran,[8] Appellant opened an account (the "Account") with Bittrex.[9]  The Plan Administrator does not dispute that Bittrex violated the OFAC regulations by offering and providing

---

[4] In basic terms, 31 C.F.R. § 560.204 and 31 C.F.R. § 560.206 prohibit a U.S. person from exporting services to Iran, including individuals who are ordinarily resident in Iran.

[5] 1/16/24 Tr. at 57, 112 (A2534, A2589); A8949–57; A5987.

[6] 1/16/24 Tr. at 128–30 (A2605–07); A8949–50, A8957.

[7] 1/16/24 Tr. at 48-49 (A2525–26) (Maria testimony that Ghader provided Iranian passport); 1/17/24 Tr. at 337 (A2814) (Ghader testimony that he provided Bittrex an address in Dubai, U.A.E. that he purchased for mail forwarding); 1/18/24 Tr. at 485 (A2962–63) (Ghader testimony that he purchased Dominica passport but never resided there).

[8] 1/17/24 Tr. 307:23–308:13 (A2784–85) (Ghader testimony); A2107 (Appellant's Notice of Errata correcting previous inaccuracies and admitting that he "was a resident of Iran, as contemplated under 31 C.F.R. § 560.204, when he opened his Bittrex account on June 10, 2017" and "remained a resident of Iran, as contemplated under 31 C.F.R. § 560.204, through January 1, 2019").

[9] 1/18/24 Tr. 449 (A2926) (Ghader testimony).

4

services to Appellant in June of 2017.[10]  Appellant registered as a customer on Bittrex's website by (i) providing his email address (which became his username); and (ii) accepting BUS's terms of service (A7092–7101) (the "2015 Terms of Service").[11]  Appellant searched the 2015 Terms of Service for references to Iran or Sanctions but neither word appears there; rather, the 2015 Terms of Service references a restriction on users being in embargoed countries.[12]  Appellant then "accepted and [] agreed" to the 2015 Terms of Service.[13]

The 2015 Terms of Service: (1) bar liability for incidental, consequential, and punitive damages; and (2) limit all liability to 12 months of commissions preceding the event giving rise to the claim.[14]  Further, the 2015 Terms of Service prohibit residents of Iran from using Bittrex's platform.[15]  And the 2015 Terms of Service permit Bittrex to suspend a customer's account for any reason without incurring liability to the customer.[16]

Upon opening his Account with his email, creating a password, and checking the box to consent to the 2015 Terms of Service, Appellant was able to immediately deposit and trade

---

[10] *See* First Day Declaration ¶ 13 (A80).

[11] 1/16/24 Tr. at 46:8–15, 47:15–17, 47:20-23 (A2523–24) (Maria testimony); 1/18/24 Tr. at 498 (A2975) (Ghader testimony); A9024 (Bittrex website "sign up" page);  A1014 (Appellant's response to claim objection, ¶ 11 ("At the time that he opened the Enhanced Account, Mr. Ghader agreed to Bittrex Inc.'s 2015 version of its Terms and Services attached hereto as Ex. B.")).

[12] 1/17/24 Tr. at 319 (A2796) (Ghader testimony).

[13] 1/16/24 Tr. at 46:8–15, 47:15–17, 47:20–23 (A2523–24) (Maria testimony); 1/18/24 Tr. at 498 (A2975) (Ghader testimony); A9024 (Bittrex website "sign up" page);  A1014 at ¶ 11.

[14] A7099 (2015 Terms of Service § 19 ("Limitation of Liability")).

[15] A7092 (2015 Terms of Service § 2.1 ("Eligibility")).

[16] A7093 (2015 Terms of Service § 4.1 ("Conditions and Restrictions")).

cryptocurrency.[17]  Between June 10, 2017 and October 11, 2017, Appellant made 27 deposits into his Account, investing over $1,300,000 in Bitcoin (299) and Ark token (over 60,000), as well as other cryptocurrency tokens.[18]

Appellant voluntarily submitted to BUS's verification process for an "enhanced account" (allowing him to trade or withdraw larger amounts of cryptocurrency).[19]  Appellant provided Bittrex his Iranian passport, Iranian phone number and a mailing address in the United Arab Emirates ("UAE").[20]  Appellant testified that he provided a mailing address in the UAE so that he could receive mail from countries, such as the United States, from which delivery would be precluded under the OFAC regulations to an Iranian address.[21]

### C.    The OFAC Subpoena

On October 10, 2017, Bittrex received a subpoena from OFAC requesting information concerning Bittrex's relationship with entities or individuals in Iran (the "Subpoena").[22]  Immediately after receiving the Subpoena, Bittrex suspended the accounts of all customers with ties to Iran.[23]  The freeze imposed by Bittrex meant that funds that had been placed on the Exchange by residents of Iran could not be accessed or recovered from the Exchange while OFAC was conducting the investigation

---

[17] 1/16/24 Tr. at 60-62 (A2537–38) (Maria testimony); 1/17/24 Tr. at 357:19–24 (A2834) (Ghader testimony); 1/18/24 Tr. at 454–55 (A2931–32) & 461–62 (A2938–39) (Ghader testimony).

[18] 1/18/24 Tr. at 451–62 (A2928–39 (Ghader testimony).

[19] 1/16/24 Tr. at 48:17–21 (A2525) (Maria testimony); A2603.

[20] 1/18/24 Tr. at 477:11–19 (A2954) (Ghader testimony); 1/16/24 Tr. at 131:16–24 (A2608) (Maria testimony); 1/16/24 Tr. at 48-49 (A2525–26) (Maria testimony); 1/17/24 Tr. at 337 (A2814) (Ghader testimony).

[21] 1/18/24 Tr. at 477:25–478:25 (A2954) (Ghader testimony).

[22] A8949–50; 1/16/24 Tr. at 63:18–65:1 (A2540-42) (Maria testimony).

[23] 1/16/24 Tr. at 63–65 (A2540-42) (Maria testimony).

it commenced by the Subpoena.  Appellant traded on the Exchange until October 11, 2017, at which time Bittrex disabled his Account based on its nexus to Iran.[24]

**D.    Communications Between Bittrex and Appellant**

On October 12, 2017, Appellant unsuccessfully attempted to log in to Bittrex's platform.[25] The same day, Appellant wrote to Bittrex, asking to activate his account.[26]  Appellant initially received a stock response that Bittrex used for any situation in which an account was locked.[27]  On October 16, 2017, a Bittrex employee informed Appellant that his account was under review.[28] At that time, Bittrex was evaluating the appropriate course of action to take in connection with the OFAC subpoena.[29]  Over the next few months, Appellant wrote regularly to BUS asking to reactivate his Account.[30] On January 7, 2018, a Bittrex employee asked Appellant for proof of residency in Dubai.[31] Appellant never responded.[32]  On June 27, 2018, Appellant started a conversation with a Bittrex employee, noting that he was trying to log in to his account "after 5–6 months," but his account was

---

[24] *Id.*

[25] 1/16/24 Tr. at 66–67 (A2543–44).

[26] A6793.

[27] 1/16/24 Tr. at 68 (A2545) (Maria testimony); A6793.

[28] A6793.

[29] 1/16/24 Tr. at 68 (A2545) (Maria testimony).

[30] 1/16/24 Tr. at 69:8–10 (A2546) (Maria testimony).

[31] 1/18/24 Tr. at 391–92 (A2867–68).  The BUS employee stated to Appellant: "You indicated you reside in Dubai but provided an Iranian passport. Please provide proof of residency in Dubai, or if not Dubai, please indicate where you reside."

[32] 1/18/24 Tr. at 391 (A2868) (Ghader testimony).

disabled.[33]  That same day, Bittrex informed Appellant that "federal economic sanctions law prohibits U.S. companies from engaging in economic transactions with residents of . . . Iran" and asked Appellant to respond if he believed Bittrex's conclusion was erroneous.[34]  Appellant never responded to BUS's communication relaying the suspension of his Account due to OFAC sanctions.[35]

    **E.**    **Appellant's Acceptance of the 2018 Terms of Service**

In October 2018, Bittrex decided to separate its U.S.-based customers from its international customers.[36]  This separation did not entail any transfer of assets between Bittrex entities because Bittrex kept all the assets associated with customer accounts in omnibus wallets.[37]  Because of this separation, an international customer logging in from a non-sanctioned foreign jurisdiction would be diverted automatically to the login screen of "Bittrex International" and asked to accept the related terms of service (the "2018 Terms of Service").[38]  Like the 2015 Terms of Service, the 2018 Terms of Service: (1) bar liability for incidental, consequential, and punitive damages; and (2) limit all liability to 12 months of commissions preceding the event giving rise to the claim.[39]  Further, the 2018 Terms of Service prohibited Iranian residents from using Bittrex's platform.[40]  And the 2018

---

[33] 1/16/24 Tr. at 76–77 (A2553–54); A6801.

[34] 1/16/24 Tr. at 76–77 (A2553–54); A6801–02.

[35] 1/16/24 Tr. at 76–77 (A2553–54) (Maria testimony); A6802.

[36] 1/16/24 Tr. at 78 (A2555) (Maria testimony).

[37] 1/16/24 Tr. at 78-80 (A2555–57) (Maria testimony).

[38] *Id.*

[39] A7118 (2018 Terms of Service § 17 ("Limitation of Liability")).

[40] A7103 (2018 Terms of Service § 2.2 ("Restricted Locations")).

Terms of Service permit Bittrex to suspend a customer's account for any reason without incurring liability to the customer.[41]

On November 20, 2018, Appellant tried to log in to the Bittrex platform by using a VPN that made it appear as though he was in France.[42] The Plan Administrator asserted at trial that Appellant would have been prompted to accept the 2018 Terms of Service at the time he signed onto the international website.[43] Appellant disputes having ever accepted the 2018 Terms of Service. As of November 2018, Appellant's Account had been suspended, and Appellant testified that he had no intent to accept the 2018 Terms of Service as Bittrex was not providing any services or products to him.[44] Regardless, Appellant's account remained restricted, and he was unable to execute transactions.

On December 10, 2018, Appellant asked Bittrex to reactivate his account.[45] The next day, a Bittrex employee repeated to Appellant that his account must remain suspended because "[f]ederal economic sanctions law prohibits U.S. companies from engaging in economic transactions with the residents of certain countries, including Iran."[46] Bittrex again asked Appellant to reply to the ticket

---

[41] A7113–14 (2018 Terms of Service §§ 10.2 ("Suspension or Termination of Services"); 10.3 ("No Liability")).

[42] 1/16/24 Tr. at 78-80 (A2555–57) (Maria testimony).

[43] 1/16/24 Tr. at 78–79 (A2555–56) (Maria testimony).

[44] 1/18/24 Tr. at 499:11–16 (Ghader testimony).

[45] A6803.

[46] A6803–04.

if he believed that Bittrex had erroneously concluded that he resided in a sanctioned country.[47] Appellant never responded.[48]

### F.    Appellant's Attempts to Reactivate His Account

On March 26, 2019, Appellant contacted Bittrex, asking to "activate [his] account."[49] Appellant provided Bittrex with a copy of a passport from the Commonwealth of Dominica issued on March 12, 2019.[50] Appellant never resided in the Commonwealth of Dominica but had obtained the passport by making a $100,000 donation to the government of Dominica.[51]

On March 27, 2019, Bittrex notified Appellant that his account remained disabled because Bittrex had concluded that he resided in a sanctioned jurisdiction.[52] Appellant responded by referring to his Dominica passport, asking to activate his account, and stating, "I lost the value and profit of trading and Bittrex should be responsible for that."[53] On March 28, 2019, Appellant sent to Bittrex a message similar to the one he had written the day before, this time mentioning that he had provided Bittrex his Dubai address.[54] On April 3 and 4, 2019, Appellant followed up with Bittrex by sending emails similar to his March 28, 2019 communication.[55] In support of his request to reactivate the

---

[47] *Id.*

[48] 1/16/24 Tr. at 77 (A2554) (Maria testimony).

[49] A6815.

[50] 1/18/24 Tr. at 83 (A2560) (Maria testimony); A6805–14.

[51] 1/18/24 Tr. at 485 (A2962) (Ghader testimony).

[52] 1/18/24 Tr. at 83-84 (A2560–61) (Maria testimony); A6816.

[53] 1/18/24 Tr. at 84 (A2561) (Maria testimony); A6816.

[54] A6816.

[55] A6817.

account, Appellant provided Bittrex with a March 20–April 4, 2019 statement from a London-based entity—TransferWise Ltd.—associating his name to an address in Luxembourg.[56]  Appellant testified that he never resided in Luxembourg, rather the Luxembourg address was a "business address."[57]  Also on April 3 and 4, 2019, Appellant started a separate conversation with Bittrex, claiming his account was disabled "without reason."[58]  Bittrex informed him that his account was restricted due to U.S. sanctions laws.[59]

### G.    Appellant's Attempt to Open a Second Account

On May 6, 2019, Appellant opened a second account with Bittrex by (1) using a new email address; and (2) providing his Dominica passport and the Luxembourg address.[60]  Appellant again accepted the 2018 Terms of Service.[61]  On May 8, 2019, Appellant asked Bittrex to consolidate his new account with the 2017 account.[62]  Bittrex informed Appellant that the 2017 account remained suspended until Bittrex received further directions from OFAC.[63]

---

[56] A6818.

[57] 1/18/24 Tr. at 403, 411 (A2880, A2888) (Ghader testimony).

[58] A9040.

[59] Id.

[60] 1/16/24 Tr. at 86-88 (A2563–65) (Maria testimony); 1/18/24 Tr. at 497–98 (A2973–74) (Ghader testimony); A6819–20.

[61] 1/16/24 Tr. at 86-88 (A2563–65) (Maria testimony); 1/18/24 Tr. at 497–98 (A2973–74) (Ghader testimony).

[62] 1/17/24 Tr. at 366-67 (A2843–44) (Ghader testimony); A6819–20.

[63] 1/17/24 Tr. at 366–67 (A2843–44) (Ghader testimony); A6820.

### H.    The September 2019 OFAC License

In April 2018, the Debtors applied for an OFAC license, seeking authorization to release the assets of customers residing in Iran (the "Application").[64]  On September 26, 2019, OFAC granted Bittrex a license ("OFAC License") that, in accordance with certain procedures, allowed Bittrex to return cryptocurrencies associated with accounts with an Iran nexus until the License expired on March 31, 2020.[65]  Bittrex notified all affected customers of the License through a series of emails in November 2019, December 2019, and January 2020.[66]  The Plan Administrator testified that Bittrex sent the emails to "all the email addresses of anyone whose accounts had been disabled."[67]  In these emails, Bittrex informed all customers having a nexus with Iran that Bittrex had obtained the License from OFAC and provided detailed instructions to withdraw assets before the OFAC License expired.[68]  The OFAC License required transactions with account holders who are "ordinarily resident in Iran" to be completed by March 31, 2020.[69]  Appellant asserts that Bittrex failed to inform him of the procedure required for the return of assets held in his account until February 3, 2020.  The Plan Administrator testified that he could not confirm whether Appellant received the email(s).[70]

---

[64] 1/16/24 Tr. at 88–89 (A2565–66) (Maria testimony).

[65] 1/16/24 Tr. at 90 (A2567) (Maria testimony); A7246.

[66] 1/16/24 Tr. at 91 (A2568) (Maria testimony); A2571.

[67] 1/16/24 Tr. at 91 (A2568) (Maria testimony).

[68] *Id.*

[69] 1/16/24 Tr. at 91 (A2568) (Maria testimony).

[70] 1/16/24 Tr. at 91 (A2568) (Maria testimony).

On February 3, 2020, a Bittrex employee contacted Appellant directly to encourage him to withdraw his assets pursuant to the OFAC License.[71]  Bittrex set a March 15, 2020 deadline for withdrawal to ensure time to process requests for withdrawal before March 31, 2020, as Bittrex was not permitted to allow withdrawals after that date.[72]  Appellant did not respond to Bittrex's February 3, 2020 communication until March 11, 2020.[73]  On March 11, 2020, Appellant wrote that Bittrex had disabled his account without reason, and referred to his April 3 and 4, 2019 emails.[74]  Also on March 11, 2020, Appellant initiated a separate conversation with Bittrex seeking to withdraw cryptocurrencies associated with his account.[75]  Bittrex responded by reiterating the withdrawal procedure, including the need to fill out a form that OFAC approved as part of the application process.[76]  Appellant responded by: (1) providing an OFAC withdrawal form listing balances for eight types of cryptocurrencies; and (2) promising that he would send a further withdrawal form.[77]  On the withdrawal form, Appellant reported to Bittrex, for the first time, an address in Turkey.[78]

---

[71] 1/16/24 Tr. at 95 (A2572) (Maria testimony); A6821.

[72] *Id.*

[73] 1/16/24 Tr. at 96-97 (A2573–74) (Maria testimony); 1/18/24 Tr. at 416–18 (A2893–95) (Ghader testimony); A6829, A9046.

[74] 1/16/24 Tr. at 97 (A2574) (Maria testimony); 1/18/24 Tr. at 418 (A2895) (Ghader testimony); A9040; A9046.

[75] 1/16/24 Tr. at 97 (A2574) (Maria testimony); A6829.

[76] 1/16/24 Tr. at 97-99 (A2574–76) (Maria testimony); A6829.

[77] 1/16/24 Tr. at 98 (A2575); A6822–28.

[78] A6826.

Upon receiving the withdrawal form, a Bittrex employee asked Appellant to provide a copy of his identification and a proof of location dated within the previous 90 days.[79]

Appellant asserts that, given that the OFAC License expressly authorized Bittrex to transfer account assets to Iranian residents, Bittrex's further demands for additional information and verification from Appellant caused unnecessary further delay in the return of Appellant's Account assets. The Plan Administrator testified that, before releasing funds, Bittrex required a complete file on each party that Bittrex had transacted with as with as part of their overall compliance process.[80]

On March 12, 2020, Appellant responded to Bittrex by sharing (1) a picture of Appellant holding his Dominica passport; and (2) two Turkish-language documents dated January 17 and 20, 2020. On March 21, 2020, Bittrex asked Appellant to (1) list the type of cryptocurrency on the OFAC withdrawal form; and (2) provide three differently angled pictures of him holding government-issued identification and a piece of paper with the current date.[81] Bittrex requested these three pictures to verify Appellant's account ownership, to prevent identity theft, and to comply with its know-your-customer and anti-money laundering obligations.[82]

On March 27, 2020, Appellant responded to Bittrex, stating that he would "send the requested documents [in the] next hours" and asking if Bittrex "need[ed] any other documents."[83] The same day, Bittrex let Appellant know that it was waiting for the "form and the photos" to "continue

---

[79] A6830.

[80] 1/18/24 at 213 (A2690) (Maria testimony).

[81] A6831.

[82] 1/16/24 Tr. at 100-02 (A2577–79) (Maria testimony); A6831.

[83] A6832.

14

processing [his] request."[84]  Appellant never provided Bittrex with the promised documents, and Bittrex's OFAC License expired on March 31, 2020.[85]  Appellant did not contact Bittrex for the remainder of 2020.[86]

## I.      Communications Between Appellant and Bittrex in 2021 and 2022

On January 29, 2021, Appellant contacted Bittrex, stating that he was not a resident of a restricted jurisdiction and asking Bittrex to reactivate his account or transfer the assets to another exchange.[87]  On February 4, 2021, a Bittrex employee asked for a proof of location showing Appellant's physical address and full name, and explained what Bittrex considered an acceptable proof of location.[88]  Appellant replied on February 7, 2021, providing a copy of his Dominica passport, photographs of himself, and other documents (which he described as a "Tax Certificate Number and approval letter"), and a "Certificate for address."[89]  On February 9, 2021, Bittrex asked Appellant to clarify whether one of the documents provided was a "residential tax document" or a "personal income tax statement."[90]  Appellant responded that the document he had sent to Bittrex was a "Personal Tax Identification Letter" issued by Turkish tax authorities.[91]  On February 19, 2021, Appellant received a response that Bittrex could only "accept tax documents related to your residence

---

[84] A6832.

[85] 1/16/24 Tr. at 103-04 (A2580–81) (Maria testimony); A7246.

[86] 1/16/24 Tr. at 103 (A2580) (Maria testimony).

[87] 1/16/24 Tr. at 104 (A2581) (Maria testimony); A6838.

[88] A6838.

[89] A6839.

[90] A6839.

[91] A6839.

and not your personal tax documents[,]" and that he should submit a utility bill, rental agreement, mortgage, or residential property tax filing.[92]

Bittrex determined that the documents provided by Appellant failed to establish proof of residency in a non-sanctioned jurisdiction.[93]  On February 18, 2021, Bittrex asked Appellant if he could provide any of the four acceptable "proof[s] of location" that Bittrex had requested in its earlier communication.[94]  Appellant did not respond to that request and had no further communication with Bittrex in 2021 and 2022.[95]

### J.    The October 2022 OFAC Settlement Agreement

In October 2022, OFAC and Bittrex entered into a settlement agreement.[96]  Pursuant to that settlement, Bittrex agreed to pay approximately $24.28 million to the U.S. Department of Treasury for its pre-2018 violations of OFAC regulations.[97]  The Settlement reflected OFAC's determination that Bittrex's conduct was not egregious.[98]

### K.    Appellant's Withdrawal of Most of his Account Assets

In the spring of 2023, Appellant finally established that he resided in Turkey by providing Bittrex: (1) a proof of residence issued by the Turkish government; (2) a rental agreement related to

---

[92] A6056.

[93] 1/16/24 Tr. at 106 (A2583) (Maria testimony).

[94] A6839–40.

[95] 1/16/24 Tr. at 107 (A2584) (Maria testimony).

[96] 1/16/24 Tr. at 115 (A2592) (Maria testimony); A8949, A8957.

[97] A8949, A8957.

[98] 1/16/24 Tr. at 113-14 (A2590–91) (Maria testimony); A8949, A8957.

16

real property in Turkey; (3) a utility bill; and (4) bank statements showing the residential address.[99] Between July 5 and 6, 2023, Appellant withdrew the vast majority of the assets associated with his account—an amount equal to approximately $273,000 as of May 8, 2023.[100]  He did not withdraw certain other cryptocurrency assets that were worth approximately $4,000 as of January 16, 2024.[101]

### L.    The Chapter 11 Plan

On May 8, 2023 (the "Petition Date"), each of the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases").[102]  On October 31, 2023, the Bankruptcy Court entered an order (Des. Bankr. D.I. 517) (the "Confirmation Order") confirming the Debtors' plan of liquidation (Des. Bankr. D.I. 517-1) (the "Plan").  As the Bankruptcy Court explained, "[i]n simple terms, the Plan provides that customers can take back their cryptocurrency that is presently on the Debtors' Exchange." *In re Bittrex*, 2024 WL 2347311, at *1 (citing Plan, Art. III.D.4).  On November 15, 2023 (the "Effective Date"), the Debtors filed a Notice of Effective Date. (Des. Bankr. D.I. 563.)  As of the Effective Date, all assets defined as "Wind Down Assets" vested in the Wind Down Entity, and the Debtors appointed the Plan Administrator to manage the Wind Down Entity.  (*See* Des. Bankr. D.I. 517 at ¶¶ 17.G, 52.)

### M.    The Claims, the Claim Objection, The Responses, and Evidentiary Rulings

Appellant filed 11 Proofs of Claim against the Debtors seeking over $80 million from the Debtors.[103]  Appellant and the Plan Administrator later entered into a stipulation providing that

---

[99] 1/16/24 Tr. at 107–08 (A2584–85) (Maria testimony).

[100] *Id.*

[101] *Id.*; 1/17/24 Tr. at 262–64 (A2739–41).

[102] A0001–45.

[103] A6079–6306.

Appellant held four surviving claims (the "Surviving Claims"), the total recovery could not exceed $21,835,750, the Surviving Claims are general unsecured claims and not entitled to any priority rights, and reserving all rights to litigate the merits of the Surviving Claims.[104]

Two of the Surviving Claims were for $1 million, which purportedly represented the value of the cryptocurrencies in Appellant's account at the time the account was suspended in October 2017. The other two Surviving Claims were for 750 Bitcoin in the amount of $20,835,750 for damages arising "under a number of legal theories,  including, but not limited to, fraud, breach of contract, breach of fiduciary duty, conversion, tort, civil conspiracy, emotional distress, personal injury, misrepresentation, breach of the implied duty of good faith and fair dealing, unjust enrichment, negligence, and lost profits."  (A1028, A1037.)  The Claim did not list the elements of these causes of action or explain how they were satisfied by the facts here.

On September 29, 2023, the Plan Administrator filed the Claim Objection (A0931–0954), together with a declaration in support (A6760) arguing, *inter alia*, that the 2015 Terms of Service permitted Bittrex to block Appellant's account and disclaimed liability for consequential, incidental, or punitive damages.[105]  In his response to the Claim Objection (A1011) (the "Response"), Appellant argued that the 2015 Terms of Service applied to his account, but not the 2018 Terms.  Appellant stated (1) he had "agreed to Bittrex Inc.'s 2015 version of its Terms and Services" when he opened his account (A1014); (2) the 2015 Terms of Service "apply to" his account (A1033); (3) "the 2015 Terms of Service [are] applicable to Mr. Ghader's" account (*id.*); and (4) "[t]he 2015 TOS applied to Appellant" (A1036).   Appellant attached the 2015 Terms of Service to his response.   (A1048.) Discovery followed.

---

[104] A1003-10.

[105] A0934; A0949–52.

After granting Appellant's request (A1390–1411) for a one-month continuance (A2003–2018), the Bankruptcy Court scheduled trial for Tuesday, January 16, 2024.  On Friday, January 12, 2024, Appellant informed the Bankruptcy Court that—notwithstanding his repeated position that the 2015 Terms of Service applied to his account and that he intended to pursue damages for Bittrex's alleged breach of that contract—he now intended to argue that the 2015 Terms of Service were void for illegality.  (A2457.)  The Bankruptcy Court estopped Appellant from pursuing this theory.  (A3016.)  In its Letter Ruling, the Bankruptcy Court explained that Appellant had "proffered a new argument and theory" on "effectively the day before trial" that "any contractual arrangement between Appellant and the Debtors was void *ab initio* due to the pending sanctions regime imposed by OFAC."  (*Id.*)  The Bankruptcy Court noted that this issue was "not raised in the parties' extensive submissions and was not considered in the context of discovery and trial preparation," and that it was "simply too late to raise new theories and arguments on the eve of trial."  (*Id.*)  Appellant filed his Motion for Reconsideration of the Letter Ruling after the trial.[106]

Appellant sought to offer expert testimony at the trial from Stephanie Rice regarding whether the Debtors complied with OFAC sanctions laws.  (*See* A2244.)  Ms. Rice sought to opine on whether: (1) the Debtors violated OFAC regulations; (2) the Debtors unreasonably delayed informing Appellant about the sanctions; (3) Appellant complied with the withdrawal procedures authorized by the OFAC License; and (4) the "off-ramping" of Appellant's account to Bittrex Malta, Ltd. constituted an "export of services" under federal regulations.  (*See* A2251–52.)  The Plan Administrator moved to exclude Ms. Rice's testimony because it usurped the role of the Bankruptcy

---

[106] Appellant argued that he was permitted to raise that argument at "any time," including the day before trial, and even after repeatedly admitting that the 2015 Terms of Service applied to him.  (A3076–77.)  Appellant included his substantive arguments (which the Bankruptcy Court previously had excluded) why both the 2015 and 2018 Terms of Service were illegal and therefore void. (A3081.)

Court by offering legal opinions and conclusions concerning compliance with OFAC sanctions, which were questions for the Bankruptcy Court. (A2252–54.)  The Plan Administrator also objected that Ms. Rice's testimony was irrelevant because (1) Appellant did not dispute that relevant regulations did not permit him to open an account; (2) it related to events that occurred outside of the applicable statutes of limitation; and (3) the 2015 and 2018 Terms of Service disclaimed liability. (A2254–62.)  The Bankruptcy Court excluded the testimony because, "to the extent that Ms. Rice's testimony covers the effect of applicable law and the OFAC process, that is effectively encroaching upon the province of the Court" and because the testimony would not be "helpful" to the Bankruptcy Court in the context of the dispute.  (*See* 1/16/24 Tr. at 7–8 (A2484–85).)

The Bankruptcy Court denied, however, the Plan Administrator's separate motion to exclude the testimony of Appellant's other expert, Adam Zarazinski, who opined on the value of each of the cryptocurrencies associated with Appellant's account from 2017 to 2023.  (*See id*.)

### N.      The Trial

The four-day trial began on January 16, 2024.  The Bankruptcy Court admitted 70 exhibits and heard testimony from the Plan Administrator, the Debtors' Chief Restructuring Officer, Appellant, and Mr. Zarazinski.  The Plan Administrator testified for nearly two days, outlining Appellant's transactions on the Platform in 2017, communications between Appellant and Bittrex from 2017 to 2023, and the OFAC License.  The Debtors' Chief Restructuring Officer testified about the value of the crypocurrencies associated with Appellant's account: approximately $4,000 as of January 16, 2024.  Appellant then testified for nearly two days, discussing his familiarity with United States sanctions against Iran, his transactions on the Platform, his communications with Bittrex from 2017 to 2023, and how he calculated nearly $21 million in damages based on cryptocurrencies worth

approximately $4,000 on January 16, 2024.[107]  Appellant's expert, Mr. Zarazinski testified as to an

"alternative valuation" of damages at either $8.75 million or $3.47 million.  (*Id.*)

### O.    The Bankruptcy Court's Opinion and Order

On May 22, 2024, the Bankruptcy Court issued its 31-page Opinion sustaining the Claim

Objection, allowing Appellant's Surviving Claims to the extent of the cryptocurrencies that were

currently associated with his account, disallowing the remainder of the Surviving Claims, and denying

the Motion for Reconsideration.  *In re Bittrex*, 2024 WL 2347311, at *19.

The Bankruptcy Court held that both the 2015 and 2018 Terms of Service barred liability for

incidental, consequential, and punitive damages; limited liability to 12 months of commissions

preceding the event giving rise to the claim; and permitted Bittrex to suspend Appellant's account for

any reason without incurring liability.  *See id*. at *12.  The Bankruptcy Court pointed to Appellant's

admissions, his testimony, the Plan Administrator's testimony, and the Terms of Service, which

demonstrated that (1) Appellant agreed to both the 2015 and 2018 Terms of Service, and (2)

Appellant's numerous judicial admissions that the 2015 Terms of Service applied to his relationship

with the Debtors.  *See id*. at *13–14.  The Bankruptcy Court rejected Appellant's argument that he

did not understand the Terms of Service because the "testimony at trial revealed that Appellant is a

sophisticated and capable businessman," the "2015 and 2018 Terms of Service are abundantly clear,"

and Appellant's testimony "showed he read and understood at least the 2015 Terms of Service."  *Id*.

---

[107] At trial, Appellant testified that he calculated his Claims by determining the all-time-high price of each cryptocurrency held in his Account during the time his Account was frozen.  (1/18/24 Tr. at 520:22–524:19.)  Appellant testified that he then converted the U.S. dollar value of his cryptocurrency into Bitcoin and calculated the value of the cryptocurrency in his Account to be worth at around 847 Bitcoin.  (*Id*.)  Appellant rounded the amount of Bitcoin down from 847 to 750, however, and then multiplied 750 Bitcoin by the price of Bitcoin on the Petition Date to arrive at the claim amount of $20,835,750.  (*Id*. at 523:2–524:19.)

at *15.  The Bankruptcy Court held that the damages disclaimers and limitations on liabilities were enforceable under Washington law.  *See id.*

The Bankruptcy Court further held that, even if the Terms of Service were not applicable, each of Appellant's non-contract causes of action was untimely.  *See id*. at *15–16.   The Bankruptcy Court found, based on Appellant's testimony concerning his communications with Bittrex, that Appellant knew in October 2017 that Bittrex had disabled his account due to Iran sanctions, and therefore, the applicable statutes of limitations began to run in October 2017.   *See id*. at *17.  The applicable statutes of limitations on each of the causes of action Appellant pleaded in his Proof of Claim had run by the time the Debtors filed bankruptcy in 2023.  *See id.*

The Bankruptcy Court held further that, even if the 2015 and 2018 Terms of Service were not applicable, to the extent Appellant predicated his causes of action on his inability to withdraw cryptocurrencies after May 8, 2020, such claims were not viable because it was Appellant's own failure to "provide sufficient proof of residency outside of Iran" that rendered him unable to make withdrawals from his account.  *See id*. at *18.  The Bankruptcy Court further held that, even if the Terms of Service were not applicable, and even if he had viable causes of action based on his inability to withdraw cryptocurrencies after May 8, 2020, Appellant had failed to prove damages incurred after May 8, 2020.  *See id*.

Finally, the Bankruptcy Court held that to the extent Appellant predicated his causes of action on his inability to withdraw cryptocurrencies after May 8, 2020, those claims failed under Washington's independent duty doctrine because Appellant failed to identify any duty independent of the Terms of Service.  *See id*.  On June 4, 2024, the Bankruptcy Court entered the Order sustaining the Claim Objection and denying the Motion for Reconsideration.

**P.    The Appeal**

On June 10, 2024, Appellant filed a timely Notice of Appeal with respect to the Order.  The overarching issue on appeal is whether the Bankruptcy Court erred in sustaining the Plan Administrator's Objection to Appellant's Surviving Claims.  (*See* D.I. 4 at 2.)  Appellant identified the following sub-issues: whether the Bankruptcy Court erred in (1) entering the Letter Ruling precluding Appellant from arguing that the Terms of Service violated the Iranian Transactions and Sanctions Regulations ("ITSR"), 31 C.F.R. § 560, and are thus void *ab initio* and not enforceable; (2) denying Appellant's arguments on reconsideration that the Terms of Service are void as a matter of public policy and their illegality may be raised at any time; (3) entering the Expert Ruling, excluding the testimony of Appellant's ITSR and OFAC expert Ms. Rice; and (4) holding that: Appellant accepted the Terms of Service; the Terms of Service are enforceable against Appellant; Appellees did not breach the Terms of Service; Appellant's claims of negligence, negligent misrepresentation, conversion, fraud, breach of fiduciary duty, unjust enrichment, negligent or intentional emotional distress, and civil conspiracy claims expire after a three-year limitations period; Appellant's tort claims and non-contract causes of action are time-barred; Appellant's tort claims fail under the State of Washington's independent duty doctrine; Appellees did not violate the State of Washington Unfair Business Practices Act, RCW 19-86-020; and Appellant failed to prove the Surviving Claims by a preponderance of the evidence.  (*See* D.I. 4 at 2–3.)

On December 11, 2024, the appeals were fully briefed.[108]  (D.I. 18, 20, 23.)  The Court did not hear oral argument because the facts and legal arguments are adequately presented in the briefs and record, and the decisional process would not be significantly aided by oral argument.

---

[108] On February 25, 2025, following completion of briefing, Appellant filed a motion (D.I. 19) (the "Motion to Consolidate") seeking to consolidate his appeal with certain already consolidated

## III.    JURISDICTION AND APPLICABLE STANDARDS

District courts have mandatory jurisdiction to hear appeals "from final judgments, orders, and decrees."  28 U.S.C. § 158(a)(1).  "An order allowing or disallowing a claim is a final, appealable order."  *In re Prosser*, 388 F. App'x 101, 102 n.1 (3d Cir. 2010) (quoting *Orsini Santos v. Mender,* 349 B.R. 762, 768 (1st Cir. BAP 2006)).

With respect to whether the Claim Objection was properly sustained, the Court reviews the Bankruptcy Court's findings of fact for clear error and exercises plenary review over questions of law.  *In re Millennium Lab Holdings II, LLC*, 591 B.R. 559, 570 (D. Del. 2018).  The Bankruptcy Court's decision to preclude Appellant from raising a new argument is reviewed for abuse of discretion.  *Latona v. Prison Health Servs. Inc.*, 397 F. App'x 807, 812 (3d Cir. 2010).  The Bankruptcy Court's denial of Appellant's motion to reconsider is reviewed for abuse of discretion, and is reviewed de novo only to the extent that the denial is based on purely legal issues.  *Gibson v. State Farm Mutual Auto. Ins. Co.*, 994 F.3d 182, 186 (3d Cir. 2021).  The Bankruptcy Court's exclusion of expert testimony is reviewed for abuse of discretion.  *Klatch v. Sugarload Tp.*, 172 F. App'x 404, 407 (3d Cir. 2006).

The Plan Administrator objected to the Claims under section 502(b)(1) of the Bankruptcy Code, which provides that a court will disallow a claim to the extent it is unenforceable under applicable law.  *See In re Combustion Eng'g,  Inc*., 391 F.3d 190, 245 n.66 (3d Cir. 2004).  As the Bankruptcy Court explained, the burden of proof for a claim filed in a bankruptcy proceeding "rests on different parties at different times."  *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173 (3d Cir. 1992).  Initially, the claim holder must establish the prima facie validity of the claim.  Bankruptcy Rule

---

fully-briefed appeals pending at Civ. No. 24-714-JLH.  As the appeal was already fully briefed, there was no practical reason to further consolidate it with the other fully briefed separate appeals.

3001(f) provides that a proof of claim executed and filed in accordance with the rules of procedure (i.e., includes the facts and documents necessary to support the claim), constitutes prima facie evidence of the validity and amount of the claim. Fed. R. Bankr. P. 3001(f); *In re Samson Res. Corp.*, 569 B.R. 605, 615 (Bankr. D. Del. 2017); *In re F-Squared Inv. Mgmt., LLC*, 546 B.R. 538, 543 (Bankr. D. Del. 2016) ("Because a properly filed proof of claim is treated not merely as a document containing arguments and assertions, but as evidence that sufficiently supports its claims, a proof of claim that is filed 'in accordance' with Bankruptcy Rule 3001 serves to satisfy the claimant's initial burden of production.") The claim objector must then produce evidence that, "if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency." *Allegheny*, 954 F.2d at 173. At that point, the burden shifts back to the claim holder to prove the validity of the claim by a preponderance of the evidence. *Id*. at 174. The ultimate burden of persuasion rests on the claim holder. *In re Samson Res.*, 569 B.R. at 615.

## IV.    ANALYSIS

### A.    The Bankruptcy Court Did Not Abuse its Discretion in Sustaining the Claim Objection

The Bankruptcy Court correctly held that both the 2015 and 2018 Terms of Service barred the kind of consequential damages Appellant seeks in his Surviving Claims. *In re Bittrex*, 2024 WL 2347311 at *12, *15. The record supports the findings that the Terms of Service, in conspicuous language that Appellant understood, permitted Bittrex to suspend an account for any reason without incurring liability and disclaimed consequential, incidental, and punitive damages.

#### 1.    Appellant Failed to Establish Any Basis for Liability

The crux of Appellant's claims is that Bittrex wrongfully refused to disburse his cryptocurrency upon his request. As the Bankruptcy Court correctly noted, both the 2015 and 2018 Terms of Service explicitly and unequivocally reserved Bittrex's right to do exactly that:

- "We may, at any time and in our sole discretion, . . . impose any other conditions or restrictions upon your use of the Services, without prior notice." A7093 (2015 Terms of Service, Section 4.1);

- We may terminate your access to the Services in our sole discretion, immediately and without prior notice, and delete or deactivate your Bittrex account and all related information and files in such account without liability to, including, for instance, in the event that breach any of these Terms." A7098 (2015 Terms of Service, Section 16);

- Further, we may, in our sole discretion and without liability to you, with or without prior notice and at any time, modify or discontinue, temporarily or permanently, any portion of our Services." *Id.*;

- "Bittrex may . . . suspend or terminate your access to the Services to comply with applicable laws or regulations or an order from law enforcement or other governmental authority, for other reasons as specified in these Terms or otherwise at Bittrex's discretion." A7106 (2018 Terms of Service, Section 4);

- "Bittrex may impose limits on the amount of any inbound or outbound transfers, or suspend or terminate the ability to transfer Tokens into or out of your Hosted Wallet or fiat currency into or out of your Bittrex Account in order to comply with applicable laws or regulations, an order from law enforcement or other governmental authority, or otherwise at Bittrex's discretion." A7108 (2018 Terms of Service, Section 6.4);

- "Bittrex may, at its discretion and without liability to you, with or without prior notice and at any time, temporarily suspend or permanently terminate your access to all or a portion of any Services." A7113 (2018 Terms of Service, Section 10.2);

*See In re Bittrex*, 2024 WL 2347311, at \*12-13 (discussing these and other provisions). When Appellant failed to provide Bittrex with proof that he was not subject to U.S. sanctions, Bittrex had the right to suspend his account without incurring liability for consequential damages. *See id.* Appellant's argument to the contrary contradicts the plain terms of the contracts to which he agreed. To accept his position, the Bankruptcy Court would have had to conclude that Bittrex was required to wire funds to an Iranian national who continually ignored requests that he show that he is not subject to U.S. sanctions. The Bankruptcy Court rejected that position, and this Court cannot say its decision was wrong.

### 2.      The Damages Disclaimers Are Enforceable Under Washington Law

Even assuming that Appellant had established a basis for liability, the Bankruptcy Court correctly concluded that the damages disclaimers in the Terms of Service preclude the recovery sought.  *In re Bittrex*, 2024 WL 2347311, at *12.  The Court agrees with the Bankruptcy Court's determination that the damages disclaimers are enforceable under applicable Washington law[109] because (1) the language of the disclaimers is conspicuous, and (2) Appellant had "a reasonable opportunity to understand the terms of the clause."  *Puget Sound Fin., L.L.C. v. Unisearch, Inc.*, 146 Wash. 2d 428, 441 (2002)).

Section 19 of the 2015 Terms of Service states, in all caps:

> [BITTREX] SHALL HAVE NO LIABILITY FOR, AND YOU RELEASE [BITTREX] FROM, ALL DAMAGES, COSTS AND LIABILITIES ARISING FROM OR RELATED TO YOUR USE OR INABILITY TO USE THE SERVICES OR BITTREX MATERIALS, INCLUDING WITHOUT LIMITATION ANY DIRECT, INDIRECT, INCIDENTAL, CONSEQUENTIAL, ECONOMIC, SPECIAL OR PUNITIVE DAMAGES OR DAMAGES FOR LOSS OF DATA, EVEN IF [BITTREX] HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. IN NO EVENT SHALL THE AGGREGATE LIABILITY OF [BITTREX], WHETHER IN CONTRACT, WARRANTY, TORT (INCLUDING NEGLIGENCE, WHETHER ACTIVE, PASSIVE OR IMPUTED), PRODUCT LIABILITY, STRICT LIABILITY OR OTHER THEORY, ARISING OUT OF OR RELATING TO THE USE OF OR INABILITY TO USE THE SERVICES AND/OR CONTENT EXCEED THE FEES PAID BY YOU TO BITTREX DURING THE 12 MONTHS IMMEDIATELY PRECEDING THE DATE OF ANY CLAIM GIVING RISE TO SUCH LIABILITY.

(A7099.)  Similarly, sections 16 and 17 of the 2018 Terms of Service state, in all caps:

16. DISCLAIMER OF DAMAGES

> IN NO EVENT WILL BITTREX, INC., BITTREX MALTA, EACH OF THEIR RESPECTIVE AFFILIATES AND THEIR RESPECTIVE SHAREHOLDERS,       MEMBERS,       DIRECTORS,       OFFICERS, EMPLOYEES,   ATTORNEYS,   AGENTS,   REPRESENTATIVES,

---

[109] A7100, A7119 (Washington choice-of-law provisions for both Terms of Service).

SUPPLIERS OR CONTRACTORS BE LIABLE FOR ANY INCIDENTAL, INDIRECT, SPECIAL, PUNITIVE, CONSEQUENTIAL OR SIMILAR DAMAGES OR LIABILITIES WHATSOEVER (INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOSS OF DATA, INFORMATION, REVENUE, PROFITS OR OTHER BUSINESS OR FINANCIAL BENEFIT) ARISING OUT OF OR IN CONNECTION WITH THE SITE, THE SERVICES, THE BITTREX MATERIALS, ANY PERFORMANCE OR NON-PERFORMANCE OF THE SERVICES, OR ANY OTHER PRODUCT, SERVICE OR OTHER ITEM PROVIDED BY OR ON BEHALF OF BITTREX, WHETHER UNDER CONTRACT, STATUTE, STRICT LIABILITY OR OTHER THEORY (INCLUDING, FOR AVOIDANCE OF DOUBT, ANY NEGLIGENCE OF BITTREX), EVEN IF BITTREX HAS BEEN ADVISED OF THE POSSIBILITY OF ANY SUCH DAMAGES.

17. LIMITATION OF LIABILITY

IN NO EVENT WILL THE LIABILITY OF BITTREX, INC., BITTREX MALTA, EACH OF THEIR RESPECTIVE AFFILIATES AND THEIR RESPECTIVE SHAREHOLDERS, MEMBERS, DIRECTORS, OFFICERS, EMPLOYEES, ATTORNEYS, AGENTS, REPRESENTATIVES, SUPPLIERS OR CONTRACTORS ARISING OUT OF OR IN CONNECTION WITH SITE, THE SERVICES, THE BITTREX MATERIALS, ANY PERFORMANCE OR NONPERFORMANCE OF THE SERVICES, OR ANY OTHER PRODUCT, SERVICE OR OTHER ITEM PROVIDED BY OR ON BEHALF OF BITTREX, WHETHER UNDER CONTRACT, STATUTE, STRICT LIABILITY OR OTHER THEORY (INCLUDING, FOR AVOIDANCE OF DOUBT, ANY NEGLIGENCE OF BITTREX) EXCEED THE AMOUNT OF THE FEES PAID BY YOU TO BITTREX UNDER THIS AGREEMENT IN THE TWELVE-MONTH PERIOD IMMEDIATELY PRECEDING THE EVENT GIVING RISE TO THE CLAIM FOR LIABILITY.

(A7117.) All-caps disclaimers qualify as "conspicuous" under Washington law. *See Stokes v. Bally's Pacwest, Inc*, 113 Wash. App. 442, 446 (2002) (explaining that releases in capital letters were "sufficiently conspicuous to be enforceable"); *Chauvlier v. Booth Creek Ski Holdings, Inc.*, 109 Wash. App. 334, 342 (2001) (same). And there was ample evidence supporting the Bankruptcy Court's finding that the provision was clear and that Appellant had a "reasonable opportunity to understand the terms of the clause." *Puget Sound*, 146 Wash. 2d at 441. Appellant demonstrated that

he had a sophisticated understanding of United States sanctions law, testifying that he followed developments in sanctions against Iran, discussed Iran sanctions in chatrooms with other cryptocurrency traders, and understood the distinction between purchasing goods or services from American companies "directly" as opposed to "indirectly" as an Iranian resident.  (A2792–94, A2902.)  Appellant also testified that he reviewed the 2015 Terms of Service before agreeing to them.  (A2796, A7092.)   Accordingly, there is no clear error in the Bankruptcy Court's determinations that the damages disclaimers were "abundantly clear" to Appellant, a "sophisticated and capable businessman," who had a reasonable opportunity to understand the damages disclaimers, and that the damages disclaimers are enforceable under Washington law.  *In re Bittrex*, 2024 WL 2347311, at *15.

### 3.    Appellant Accepted the 2015 Terms of Service

The record provides ample support for the Bankruptcy Court's finding that Appellant accepted the 2015 Terms of Service.  The Plan Administrator testified that customers agreed to the Terms of Service when they opened accounts or accessed accounts following changes in the Terms.  (1/16/24 Tr. at 46–47 (A2523–24, A2556).)  Appellant testified that he accepted the 2015 Terms of Service.  (1/18/24 Tr. at 498 (A2975).)  Documentary evidence of Bittrex's transaction log and sign-in page further corroborated that testimony by showing that Appellant "checked the box" that indicated he agreed to the Terms of Service.  (A7000, A9024.)

Having properly concluded that the Terms of Service were enforceable and that Appellant agreed to them, it follows that Appellant is bound by the damages disclaimers which preclude his claims for millions of dollars in consequential damages.

### 4.    The Bankruptcy Court Did Not Abuse its Discretion in Precluding Appellant from Arguing that the Terms of Service Were Void

Appellant asserts that the Bankruptcy Court erred as a matter of law and abused its discretion

by excluding argument and briefing on the illegality and unenforceability of the Terms of Service as a matter of federal and state law. In exercising its discretion, the Bankruptcy Court noted that "extensive briefing and discovery (including multiple depositions) occurred in anticipation of a trial that commenced on January 16, 2024" and Appellant's "new argument and theory" was not proffered until January 12, 2024, "effectively the day before trial." (A3016.)

Appellant asserts that the Bankruptcy Court committed reversible error because (i) the illegality and unenforceability of the Terms of Service may be raised and considered at any time, and (ii) federal and state cases have ruled that contracts made in violation of the ITSR are null and void as a matter of law and as a matter of public policy. (D.I. 12 at 41–46; D.I. 18 at 6–9.)

Appellant's theory that the Terms of Service were void *ab initio* and unenforceable, raised for the first time one business day before trial, was surprising, not only in light of his pending claims for damages based on **breach** of the Terms of Service and **breach** of the implied covenant of good faith and fair dealing under the Terms of Service, for which the parties had conducted months of discovery, but also in light of his previous admissions, contained in his Response to the Claim Objection, that the 2015 Terms of Service applied to him. (*See* Response, A1014 ("At the time that he opened the Enhanced Account, Mr. Ghader agreed to Bittrex Inc.'s 2015 version of its Terms and Services"); *id.* A1033 ("Rather, the only Terms of Service that apply to Mr. Ghader's Enhanced Account and Wallet are the 2015 TOS"; *id.* ("The limitations and restrictions noted in the 2018 TOS do not exist in the 2015 Terms of Service (the '2015 TOS') applicable to Mr. Ghader's Enhanced Account and Wallet"); A1036 ("The 2015 TOS applied to Mr. Ghader.").)

Setting aside the fact that Appellant argues, on the one hand, that the Terms of Service were void at their inception, and seeks, on the other hand, damages for breach of the Terms of Service, the Court agrees with the Plan Administrator that the Bankruptcy Court was well within its discretion to preclude Appellant from raising this new argument, which was inconsistent with his many prior

30

admissions, one business day before trial, and long after the parties had completed discovery. It was no abuse of discretion for the Bankruptcy Court to conclude that it "is simply too late to raise new theories and arguments on the eve of trial."[110] (A3017.) *See Dastranj v. Dehghan*, 2017 WL 3531476, at *7–8 (D. Md. Aug. 17, 2017) (rejecting party's untimely argument that an agreement was illegal in light of Iranian sanctions because "illegality is an affirmative defense that must be raised timely or it is waived").

### 5. The Bankruptcy Court Did Not Abuse its Discretion in Denying the Motion for Reconsideration

Appellant argues that the Bankruptcy Court abused its discretion when it summarily denied Appellant's Motion for Reconsideration of the Letter Ruling. The Motion for Reconsideration did not raise any new fact or authority material to the Bankruptcy Court's decision that Appellant waived his argument by raising it in the eve of trial. (A3076). The Bankruptcy Court was within its discretion to deny Appellant's argument the second time it was raised.

---

[110] Appellant suggests that Washington law might apply to the question of whether a party can waive or forfeit his argument that a contract is illegal and that, under Washington law, the defense of illegality can be raised at any time. In support of his argument, Appellant cites *Reed v. Johnson*, 27 Wash. 42, 55 (1901) ("the illegality of a contract (and the ensuing lack of jurisdiction) may be raised at any time" (citing *Oscanyan v. Arms Co.*, 103 U.S. 261, 267 (1880) (stating that contractual illegality cannot "be obviated or waived," "even by the express stipulation of the parties," for "it is one which the court itself [i]s bound to raise in the interest of the due administration of justice")).

Accepting Appellant's suggestion—for the sake of the argument only—that Washington law applies, more recent decisions abrogate the holding in *Reed*. In *Davidson v. Hensen*, 135 Wash. 2d 112 (1998), the Washington Supreme Court referred to *Reed* as "older case law" that is inconsistent with a "modern distinction" between contracts that are void *ab initio* as being "criminal or against public morals/policy" and contracts that "may not be enforced by certain parties under certain circumstances." *Id.* at 130. The Washington Supreme Court explained that this "distinction is echoed in more recent Washington cases" and it noted that the older cases predated "modern court rules which require affirmative defenses to be timely asserted or waived." *Id.* at 130, 133. For these reasons, the Washington Supreme Court held in *Davidson* that a defendant waived the argument that a contract was illegal for violating a statute when it failed to raise that argument in arbitration.

B.    **The Court May Affirm the Order on Additional Bases**

1.    **Appellant Demonstrated No Error in the Bankruptcy Court's Statute of Limitations Analysis**

The Bankruptcy Court further held that, even if the Terms of Service did not apply, Appellant's other claims are time-barred.  *In re Bittrex*, 2024 WL 2347311, at *16.  Appellant does not contest the Bankruptcy Court's decision in that regard, except as it relates to his claims for: (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing; and (3) Washington's Consumer Protection Act.  (*See* D.I. 12 at 49–50.)  With respect to breach of contract, as discussed, the Bankruptcy Court did not hold that his contract claim was time-barred but rather correctly held that it lacked merit.  *See id.* at *12 (citing 2015 Terms of Service, §§ 4 & 16).

With respect to breach of the implied covenant of good faith and fair dealing, the Bankruptcy Court correctly held that there are two possible statutes of limitations: six years, "if the implied duty arises out of a written agreement," or otherwise three years.  *In re Bittrex*, 2024 WL 2347311, at *17 (quoting *Davenport v. Wash. Educ. Ass'n*, 147 Wash. App. 704, 737 (Wash. Ct. App. 2008)).  As the Bankruptcy Court explained, the damages disclaimers in the Terms of Service preclude Appellant from recovering on an implied-covenant theory that "arises from" the Terms of Service.  *See id.* at *17.  "To the extent Mr. Ghader relies on some other extra-contractual claim, the applicable statute of limitations is three years."  *Id*.

Finally*,* Appellant argues that the Bankruptcy Court did not address his cause of action under the Washington Consumer Protection Act ("CPA"), but that is not correct.  *See id*. at *17 n.170.  As the Bankruptcy Court explained, Washington law sets the statute of limitations for a violation of the CPA at four years.  RCW 19.86.120.  *See id.*  The Bankruptcy Court explained that any claim under the Washington Consumer Protection Act that accrued earlier than four years before May 8, 2023 (i.e., May 8, 2019) would be untimely.  *Id.*  The Court agrees that, because Appellant's claims accrued,

at the latest, on October 12, 2017, a CPA claim was time-barred.

### 2. Appellant Demonstrated No Error in the Bankruptcy Court's Determination that Appellant Failed to Establish Damages within the Limitations Period

Nor does Appellant contest the Bankruptcy Court's holding that, even if he had not waived any right to consequential damages by agreeing to the Terms of Service, his proof of damages after May 8, 2020 was inadequate. *In re Bittrex*, 2024 WL 2347311, at *18. Appellant elicited expert testimony from Adam Zarazinski, who opined about the maximum value of cryptocurrencies associated with Appellant's account from October 11, 2017 to July 9, 2023, and from April 1, 2020 through July 9, 2023. (A3043–45.) His testimony, however, did not provide any analysis that was limited to the period after May 8, 2020. His opinion thus provided no basis for the Bankruptcy Court to calculate damages within the limitations period. Nor is there other evidence in the record that illuminates that question. Because Appellant bears the burden of proof, *Allegheny Int'l*, 954 F.2d at 173, the Bankruptcy Court correctly sustained the Claim Objection.

### 3. Appellant Demonstrated No Error in the Bankruptcy Court's Holding that the Independent Duty Doctrine Precludes His Claims Within the Limitations Period

The Bankruptcy Court correctly sustained the Claim Objection on the additional basis that Appellant failed to identify any duty that Bittrex owed that was independent of the 2015 and 2018 Terms of Service. *In re Bittrex*, 2024 WL 2347311, at *18. The independent duty doctrine prohibits a party to a contract from bringing tort claims against his counterparty unless the former can show that the latter breached a tort duty arising independently of the terms of the contract. *See e.g., Olympic Tug & Barge, Inc. v. Lovel Briere LLC*, 668 F. Supp. 3d 1165, 1176 (W.D. Wash. 2023) (dismissing conversion claim based on independent duty doctrine); *Mansur Props. LLC v. First Am. Title Ins. Co.*, 635 F. Supp. 3d 1116, 1126–27 (W.D. Wash. 2022) (dismissing negligence claim based on independent duty doctrine).

Here, the only duty that Bittrex conceivably could have owed to Appellant arises from the Terms of Service.  In any event, Appellant has not identified any other duty.  Instead, he merely argues that the independent duty doctrine does not bar *all* tort claims where there is an underlying contract.  (D.I. 12 at 50–51.)  Regardless, the independent duty doctrine bars Appellant's tort claims because he has failed to identify any basis to require Bittrex to release his funds except for the Terms of Service.  Appellant has shown no error in the Bankruptcy Court's decision.

### C.    Appellant Fails to Show that the Expert Ruling Was an Abuse of Discretion

The Bankruptcy Court granted the Plan Administrator's motion to exclude the testimony of Ms. Rice, who Appellant offered as an expert on OFAC and the ITSR regulations.  Appellant argues that the Expert Ruling was an abuse of discretion because she was qualified, "[h]er opinions [] were appropriate and helpful," and her "testimony was reliable and highly relevant to the matters to be considered at trial with respect to Appellant's Claims."  (D.I. 12 at 39–40.)  Appellant does not meet the high bar to show that the Bankruptcy Court abused its discretion by declining to hear that testimony.  *See Klatch*, 172 F. App'x at 407 (trial court has discretion to admit or exclude evidence).

First, Appellant sought to offer testimony on legal contentions, such as "Bittrex violated OFAC regulations by allowing Mr. Ghader to open an account on the Bittrex exchange" (A2286–87), and "Bittrex failed to provide Mr. Ghader accurate information, which affected his rights and remedies" (A2288–89).  This kind of testimony on the construction of statutes and other legal issues improperly usurps the role of the trial court in deciding legal questions. It is fundamental that a trial court has discretion to exclude such testimony.  *See, e.g.*, *Berckeley Inv. Grp. Ltd. v. Colkitt*, 455 F.3d at 217-18 (excluding testimony about whether plaintiff complied with federal securities laws); *United States v. Mazumder*, 800 F. App'x 392, 395 (6th Cir. 2020) ("Expert testimony on the law is excluded because the trial judge does not need the judgment of witnesses.") (quoting *United States v. Zipkin*, 729 F.2d 384, 387 (6th Cir. 1984)); *Killion v. KeHE Distrib., LLC*, 761 F.3d 574, 593 (6th Cir. 2014)

(affirming the exclusion of expert report that "plainly attempt[ed] to define legal terms").

Second, Appellant sought to elicit from Ms. Rice testimony that Iran sanctions prohibited U.S. businesses, such as Bittrex, from opening and operating accounts on behalf of persons ordinarily resident in Iran.  (A2286–87.)  But there was no dispute that Appellant resided in Iran when he opened his account with Bittrex and, therefore, that Iran sanctions prohibited Bittrex from opening and operating an account on his behalf.  (A2791–92, A2796.)  The Bankruptcy Court was well within its discretion to exclude testimony that was only relevant to an undisputed fact.

## V.    CONCLUSION

For the reasons set forth above, the Order will be affirmed.[111]  The Court will issue a separate Order consistent with this Opinion.

---

[111] Appellant's remaining arguments are rejected.

35